IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
November 12, 2015 Session

**STATE OF TENNESSEE v. ROBERT HENRY JACKSON**

**Appeal from the Circuit Court for Williamson County**
**No. II-CR116884-A      Timothy L. Easter, Judge**

_____

**No. M2014-02039-CCA-R3-CD – Filed May 18, 2016**

_____

The Williamson County Grand Jury indicted the Defendant-Appellant, Robert Henry Jackson, for two counts of aggravated stalking, one count of coercion of a witness, and one count of contributing to the delinquency of a minor. During trial, the State dismissed the coercion of a witness count. The jury acquitted the Defendant-Appellant of the aggravated stalking counts but found him guilty of the count charging him with contributing to the delinquency of a minor, a Class A misdemeanor. See T.C.A. § 37-1-156. Following a sentencing hearing, the trial court imposed a sentence of eleven months and twenty-nine days, with the Defendant-Appellant to serve ninety days' confinement before serving the remainder of his sentence on supervised probation. On appeal, the Defendant-Appellant argues that the evidence is insufficient to sustain his conviction and that his sentence is excessive. Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

Perry A. Craft, Nashville, Tennessee, for the Defendant-Appellant, Robert Henry Jackson.

Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley, Assistant Attorney General; Kim R. Helper, District Attorney General; and Tammy J. Rettig, Assistant District Attorney General, for the Appellee, State of Tennessee.

# OPINION

ALJ,[1] who was eighteen years old at the time of trial, was born in the Ukraine in 1995. In September 1998, WJ and DJ adopted her and brought her to the United States. In the fourth grade, ALJ became friends with CJ, the daughter of Robert Henry Jackson, the Defendant-Appellant in this case. ALJ first met CJ because CJ's oldest sister was best friends with ALJ's older sister, AJ. Because ALJ was friends with CJ, she visited the Jackson home with her parents' approval "every other day" by the time she attended high school.

ALJ said that the Jacksons were naturists, or nudists, which meant that the "whole family would walk around naked" and that ALJ "would be naked" while at the Jackson home. She stated that she first started being naked at the Jackson home in fifth grade when the Defendant-Appellant invited her to go on a cruise with his family. The Jacksons told her that she "was going to be going to nude beaches and that's what [she would] have to get used to if [she] was going over there." ALJ said she and the Jackson family would swim at home while naked and that the first time she smoked "weed" was at the Jackson home. Sometimes on Sundays "there would be beers in the fridge" and the Defendant-Appellant would allow ALJ and CJ to have a beer. ALJ got drunk at the Jackson home whenever there was alcohol available, and she drank "almost every time [she] went there." The Defendant-Appellant's oldest daughter would often take photographs of ALJ and the Jackson family while they were naked. The Defendant-Appellant would tell them "not to pose and to act natural" and would sometimes say that they could not "go out to lunch until [they] were done taking photographs." ALJ acknowledged that her parents had given permission for the Jacksons to take photographs of her and that she had attended an art show with the Defendant-Appellant and his family where photographs of nude individuals had been displayed.

ALJ said that around her sixteenth birthday, being at the Jackson home "got annoying" because the Defendant-Appellant frequently commented on her body. The Defendant-Appellant told her, "I've seen many girls grow up and [your breasts are] just filling out right now, and eventually they'll fill out and get bigger." He also told her she had "a nice butt" and told her to trim, rather than shave, her pubic hair. He also told her he was a "feet person and that he loved [her] toes" and nicknamed her "Monkey Toes." She said the Defendant-Appellant discussed sexual acts with her, giving her instructions on oral sex and masturbation, and provided her with condoms so that she could have sexual relations with her boyfriend. ALJ stated that the Jacksons kept condoms in a bathroom that were easily accessed by her and CJ.

---

[1] It is the policy of this court to refer to minor victims and their family members by their initials.

The Defendant-Appellant eventually started talking to ALJ about obtaining custody of her each time she visited his home. She said he implied that she was being sexually abused at home, even though that was not the case, and told her that he would buy her a car and pay for her college if she came to live with him. ALJ explained that she loved her parents, that her home life with them was good, and that neither her parents nor her siblings had ever physically or sexually abused her.

ALJ said she was sixteen years old when she received text messages from the Defendant-Appellant and informed her family of them. At the time, she wondered if the Defendant-Appellant was going to leave her alone because she did not "want to live with him." When the Defendant-Appellant discussed obtaining custody of her, she sometimes agreed with him because it sounded fun and because it would make him stop talking about it. However, she often thought that the Defendant-Appellant was "annoying" because he had this same conversation with her "over and over again." She admitted to writing a letter to the Defendant-Appellant telling him that she wanted to live with him, but she claimed she wrote it at the direction of the Defendant-Appellant during the juvenile court case at a time when she was being disciplined by her parents.

ALJ said that in August 2011, she slashed her wrists, and her parents called the police. She acknowledged that she had history of violence when angered. She also acknowledged sneaking out of her house to meet young men to have sex and admitted introducing her younger sister EJ to this lifestyle. ALJ said she had taken the morning after pill, had contracted sexually transmitted diseases, and had stated that she had been raped. She also said she had used marijuana and LSD. ALJ admitted to intentionally cutting herself on her wrists and legs in the past and burning herself one time. Once the Defendant-Appellant sought custody of her, she began regularly cutting herself, talking back, and smoking. ALJ admitted that her parents had previously contacted the Defendant-Appellant in an attempt to get her under control and that the Defendant-Appellant had encouraged her to make better grades at school.

The following text messages between the Defendant-Appellant and ALJ were admitted at trial:

[Defendant-Appellant]: Your ipod has text working. Please use it properly. Your parents want to fight I [sic] over custody. We couldn't make them see reason. We will get a lawyer Monday to get custody. Be patient it will take time.

[Defendant-Appellant]: Don't answer yes if [your mother] asks if you want to live with us. She said if you say that, she will ship you to Texas.

-3-

Only say yes or request us to investigators, police or court. You are sixteen and have rights.

[Defendant-Appellant]: [Your mother] said you are not to contact us for help. That is never to be ob[e]yed. You contact us at once if there is any trouble. I am no longer going to give you back to them. You run. You are here for good. We love you and will help in any[]way we can.

[ALJ]: You can't contact me

[Defendant-Appellant]: Why?

[Defendant-Appellant]: What makes you think that? You just get me if you are in trouble. I will update you on your custody case as it proceeds. It's time you use your rights to protect yourself.

[ALJ]: Protect myself from what?

In October 2011, after the Defendant-Appellant had made repeated requests for ALJ's parents to come to his home to discuss something important, ALJ's parents went to the Defendant-Appellant's home. Once there, the Defendant-Appellant showed them some legal documents and informed them that he wanted custody of ALJ. He claimed he could give ALJ "a better life" and could send her to college, even though both of ALJ's parents were employed and were financially able to send ALJ to college. ALJ's parents refused and left the Jackson home. Shortly after they left, ALJ showed her parents a text from the Defendant-Appellant, telling her that she was not to obey her parents, which scared them.

On October 18, 2011, ALJ's parents received a Petition for Dependency and Neglect filed by the Defendant-Appellant and his wife in the Williamson County Juvenile Court, alleging that ALJ's parents had failed to obtain mental health treatment for ALJ, that ALJ had been living with the Defendant-Appellant and his family, that ALJ's mother repeatedly tried to provoke ALJ into physical confrontation, that ALJ's parents did not report ALJ's rape by three men until the Defendant-Appellant threatened to report the incident himself, that the conditions in ALJ's parents' home were deplorable with pet feces and urine on the floor, and that ALJ's bedroom window had been nailed shut. Before the Defendant-Appellant filed this petition, ALJ had not been charged with any criminal offenses except a tobacco citation; however, after the filing of this petition, ALJ was convicted of several serious criminal offenses.

-4-

WJ, ALJ's mother, denied all of the allegations in this petition. She stated that as soon as ALJ was released in September 2011 from Rolling Hills, a psychiatric facility, ALJ saw a therapist and a psychiatrist and underwent counseling. She asserted that ALJ never resided with the Defendant-Appellant and his family. WJ stated that she and her husband immediately reported ALJ's rape to the police the night they learned of it. She denied having poor conditions in her home, explaining that they had a puppy that sometimes had accidents on their floor, which were quickly cleaned. WJ explained that after she and her husband put alarms on all their doors, they had to nail ALJ's window shut to prevent her from sneaking out at night. Neither the Williamson County Sheriff's Department nor the Department of Children's Services made any findings that ALJ had been abused in her parents' home.

WJ said she knew the Defendant-Appellant and his family were naturists and that she allowed her three daughters to visit there. She also acknowledged that she and her husband regularly communicated with the Defendant-Appellant about ALJ in the two years prior to the filing of the dependency and neglect petition. WJ said she allowed ALJ and ALJ's younger sister, EJ, to visit the Defendant-Appellant's home until just before the Defendant-Appellant filed the dependency and neglect petition in juvenile court. WJ said that while she gave permission for ALJ to be photographed at the Defendant-Appellant's home, she never gave permission for ALJ to be photographed nude. She acknowledged discussing ALJ's birth control with the Defendant-Appellant but said it was a mistake:

> Why would [the Defendant-Appellant] give her condoms and have them in every bathroom in their house, why would he be worried . . . if she had an STD, why would his wife take her to the health department so she can get an STD check, why is he so interested in my daughter and her sexual activity. I don't know why I ever discussed [it] with him—I was just stupid.

In a December 13, 2011 agreed order, ALJ's parents acknowledged that they were "guilty of dependency and neglect" by improperly supervising ALJ. The agreed order contained a "reciprocal restraining order" that prohibited contact between the Jackson family and ALJ's family. ALJ's parents said they signed the agreed order because they initially believed the Defendant-Appellant would no longer be involved in ALJ's life. The agreed order placed restrictions on ALJ and her parents but allowed her parents to retain custody of ALJ.

Following a January 9, 2012 hearing, less than one month after entry of the agreed order, the juvenile court entered an order stating that "the Jacksons have had contact with

[ALJ] in violation of this Court's order" and that "[t]he no contact order as to said child and the family of [the Defendant-Appellant] and [the Defendant-Appellant's wife] shall remain in effect."

Sometime in January 2012, the Defendant-Appellant and his wife separately contacted the Department of Children's Services about being a foster parent for ALJ. Their requests were denied because the Department of Children's Services did not accept requests for specific children unless they were listed on the Department's website. Keiana Reed, a Department of Children's Services employee who spoke with the Defendant-Appellant, testified that the Defendant-Appellant's attitude about being a foster parent for ALJ was "overall pretty aggressive." She explained:

> Usually after I turn someone down, it's usually, you know, they either take what I'm saying or they'll come back and say, well, I'll foster . . . [who] you need me to foster, but [the Defendant-Appellant's request] was very specific, and I just couldn't help, you know, the situation. By law I can't remove children; that's a judge's decision. And even with the placement of a youth that is child-specific, that's a team decision which involves birth parents and everyone on the team. That's not my decision either.

On June 4, 2012, ALJ's father DJ filed a "runaway petition" with the Williamson County Juvenile Court regarding ALJ, which stated the following:

> On or about June 4, 2012 at approximately 10:30 AM., [ALJ] left her residence of 318 Harpeth Hills Drive in Franklin, Williamson County, Tn. [ALJ] left with the knowledge or permission of her parents. [ALJ's] whereabouts are unknown. This constitutes the offense of runaway.

Despite the allegations in the petition, DJ testified at trial that ALJ left his and his wife's home without their knowledge or permission. He said he filed the petition because, pursuant to the agreed order in juvenile court, he was required to contact the appropriate authorities if ALJ "was not . . . where she was supposed to be[.]" DJ said that, in his opinion, ALJ had "never actually run away" from their home. He clarified, "[ALJ] leaves and she goes to a friend's or with her boyfriend, but she's never run away and not come back."

ALJ's sixteen-year-old boyfriend, RH, testified at trial and said that on June 5, 2012, the Defendant-Appellant and his daughter, KJ, came to his home trying to find ALJ. The Defendant-Appellant told RH that ALJ had run away and that he wanted to obtain custody of her because she was not happy at home. The Defendant-Appellant

claimed ALJ's parents would not allow RH to see ALJ because they were prejudiced against African-Americans and that if ALJ came to live with him, RH could see her whenever he wanted. The Defendant-Appellant said he was going to take ALJ to France and get her a job there and that he had hired an attorney to represent ALJ's interests. When the Defendant-Appellant asked RH about where AE, another friend of ALJ's, lived and about whether ALJ was staying with AE, RH told him that AE lived in some apartments behind Kroger. The Defendant-Appellant asked RH to let him know if he talked to ALJ because he was "trying to help her." The Defendant-Appellant informed RH that he did not intend to follow the court order preventing him from having contact with ALJ.

The afternoon of June 5, 2012, ALJ visited her friend AE, who was also sixteen years old, at AE's home in an apartment complex in Williamson County. They went to the apartment's pool, and AE received a telephone call from ALJ's boyfriend stating that the Defendant-Appellant and his daughter had just come by his home looking for ALJ. Shortly after receiving this phone call, ALJ saw the Defendant-Appellant driving by the pool and began "freaking out" because she "was scared." When the Defendant-Appellant circled the pool two more times, ALJ ran to a stairwell in one of the nearby buildings and hid because she was afraid that the Defendant-Appellant would have her arrested. AE stayed at the pool for an additional thirty minutes until it got too hot. As she was leaving, the Defendant-Appellant pulled up beside her vehicle, and the Defendant-Appellant's daughter, KJ, exited the car and began yelling for ALJ. The Defendant-Appellant also got out his car and told AE that "they needed to talk to [ALJ] and they were going to call the police, but if [AE] got [ALJ] to talk to him, then they wouldn't call the police." At that point, AE and KJ got inside AE's car, and the Defendant-Appellant got back in his vehicle, and they began driving around the apartment complex looking for ALJ.

After hiding in the stairwell for "a really long time," ALJ ran toward AE's car. KJ told ALJ, "[W]e just want to talk to you, we just want to talk to you." KJ exited the car, walked up to ALJ, and hugged her. At the time, ALJ was concerned that she was going to be arrested for running away. Once the entire group gathered together, the Defendant-Appellant asked AE if he could speak privately with ALJ, and ALJ and the Defendant-Appellant got in the Defendant-Appellant's car. ALJ testified as to what the Defendant-Appellant told her inside the car:

> He was, like, do you want to come live with me, because . . . you can come with me now and I can hide you out at my house because that's the last place they're going to look, and then we can go to France and you can be an au pair . . . in France for his friends[.]

ALJ said that she told the Defendant-Appellant she wanted to live with him "because [she] wanted him to leave [her] alone." She explained that she was "on the run" at the time because she was on "in-home detention" and "couldn't hang out with friends[.]" ALJ exited the Defendant-Appellant's car and asked AE if the entire group could go inside her apartment so they would not be seen, and AE reluctantly agreed. The Defendant-Appellant then parked his vehicle in a nearby grocery store parking lot so that "nobody would see it," and they all went inside the apartment.

Both ALJ and AE testified that once they were inside the apartment, the Defendant-Appellant asked ALJ if she wanted to live with him. AE said the Defendant-Appellant told ALJ that he had hired an attorney for her and that if she wanted to live with him, she needed to call the attorney and turn herself in for running away. She also stated that the Defendant-Appellant made it seem like ALJ would be better off if she lived with him. AE remembered ALJ telling the Defendant-Appellant that AE would bring her to his house later that day. She stated that the Defendant-Appellant examined insect bites on ALJ's back and that ALJ asked the Defendant-Appellant for money. AE said the Defendant-Appellant told ALJ that if she came to his house he would have to call the police.

ALJ said that once they were inside AE's apartment the Defendant-Appellant talked about taking her to France again and insisted that she come with him immediately. Although ALJ "kept agreeing with him," she said she was "afraid of saying no because [she] didn't want him to call the cops . . . because he knew [she] was on the run and he had been looking for her." ALJ acknowledged that she was on runaway status at the time of this discussion and said that the Defendant-Appellant knew "she was on the run" because he told her, "I could easily call the cops right now." Although the Defendant-Appellant tried to get ALJ to leave with them that day, ALJ persuaded him to let her stay one more day at AE's apartment. ALJ remembered telling the Defendant-Appellant to come get her the next morning, because she intended to be gone by then, and the Defendant-Appellant told her to text KJ or have AE text him because the agreed order prohibited him from texting her directly.

After the Defendant-Appellant left the apartment, ALJ told AE that "she does want to [live with the Defendant-Appellant], but then she doesn't." The entire discussion at AE's apartment lasted approximately thirty to forty minutes, and the police were never informed of ALJ's whereabouts. On June 25, 2012, the Juvenile Court entered an order dismissing the Petition for Dependency and Neglect regarding ALJ, which stated the following:

The evidence showed [ALJ] continues to display challenging behavior but not from any fault of the parents['] inability to parent. Further, the petitioners' testified they do not wish to have custody of this child. Therefore, there are no further issues of dependency and neglect at this time and there are additional court-ordered interventions in place for this child. It is unnecessary and inappropriate for the Jacksons to have any further contact with [ALJ's family].

On November 16, 2012, at approximately 7:30 a.m., the Williamson County Sheriff's Department arrested the Defendant-Appellant. The Defendant-Appellant called his wife from jail around 8:00 a.m. During this conversation, the Defendant-Appellant said his computer laptop was at work, and he and his wife talked about one of their daughters taking his computer somewhere. The Defendant-Appellant's computer was of interest to law enforcement because ALJ had said that there were nude pictures on the Defendant-Appellant's laptop.

AJ, ALJ's older sister, confirmed that the Defendant-Appellant and his daughter, CJ, took nude photographs of her and ALJ at the Jackson home. She said the first time she took off her clothes at the Jacksons', she was rewarded with alcohol. AJ stated that she and ALJ commonly drank alcohol at the Jacksons' home with the Defendant-Appellant's knowledge and that the Defendant-Appellant would talk to her and his daughter about sexual matters while they were all naked in the Defendant-Appellant's hot tub. AJ asserted that the Defendant-Appellant often made comments about her body and encouraged her to trim her pubic hair.

Several individuals testified regarding the Defendant-Appellant's reputation. Sherry and David Crawford testified that they had known the Jacksons for years and had socialized and vacationed with them at their beach house in France. They stated that the Defendant-Appellant told the truth and that they had never heard the Defendant-Appellant make inappropriate sexual comments to anyone. David Crawford admitted that he and his family, including his daughters, would engage in nudity while at the Jackson home. Christina Crawford, Sherry and David Crawford's adult daughter, testified that the Defendant-Appellant had never said or done anything sexually inappropriate to her and that she had never observed him doing anything sexually inappropriate to others. She believed the Defendant-Appellant was an honest and trustworthy person and thought of him as "a second dad."

Bria Lewis testified that the Defendant-Appellant and his wife coached her soccer team as she was growing up and that she was friends with his daughters. She said the Defendant-Appellant and his wife were good, truthful people and that she had never

heard them make inappropriate sexual remarks to anyone. Lewis said she had been to the Jacksons' home hundreds of times and that once she attained the age of eighteen, she had been nude while there, although she never saw the Defendant-Appellant without clothes. She said she was never photographed at the Jackson home, never saw other girls photographed, and was never provided alcohol while she was there. She also stated that she never heard the Defendant-Appellant talking to anyone about sex toys and had never heard him give instructions to girls about how to perform oral sex.

Joel Lawler testified that he had known the Defendant-Appellant and his family for approximately six years because their daughters had been friends and because the Jacksons had been his daughter's soccer coach. Lawler, who was aware that the Jacksons were naturists, stated that the Jacksons were a good family and that the Defendant-Appellant was a truthful, honest person. He said he allowed his daughter to visit the Jackson home but that she was never nude while there.

Taylor Harris, another friend of the Jackson daughters, testified that she was often at the Jackson home and had lived with the Jacksons "a couple of times" when she was twenty or twenty-one years old. Harris said the Jacksons did not allow teenagers to get drunk, did not encourage anyone to be sexually promiscuous, and did not discuss sexually inappropriate topics at their home. She said she knew ALJ personally and asserted that the Defendant-Appellant did not allow ALJ to get drunk at his home, did not encourage ALJ to engage in sexual activities, and did not discuss sex acts with ALJ. Harris stated that the Defendant-Appellant was a good, truthful man who allowed her to live with his family when she was having problems with her own family. She said he had never done or suggested anything sexually inappropriate to her and that she considered him a "father figure." Harris said that one time when she was eighteen, the Defendant-Appellant's oldest daughter took nude photographs of her and the other Jackson daughters.

Leslie Ensley testified that she knew the Defendant-Appellant because he was her daughter's soccer coach and knew ALJ and her family because she had been ALJ's girl scout leader in elementary school. Ensley said that during the girl scout years, ALJ "was a handful, and you couldn't always trust what she said, and you had to keep a close eye on her." She said that she once called the Defendant-Appellant when she saw ALJ leave work with a boy when ALJ was on house arrest. Ensley explained that she called the Defendant-Appellant because "he seemed to have [ALJ's] best interests at heart" and believed he would talk to "whoever needed to know what was going on." She believed that the Jackson family wanted what was best for ALJ. Ensley added that when she was going through her divorce, the Jacksons provided some transportation for her daughter and that she had never heard any of the Jacksons say anything sexually inappropriate.

Laura Smith testified that she considered the Jacksons to be her "second family." She said none of the Jacksons had ever made inappropriate sexual advances or remarks to her, and she had never heard them make sexually inappropriate comments to anyone. Smith described the Defendant-Appellant as an "honorable and truthful man who had helped her with serious issues in the past." She was aware that the Jacksons were naturists, but it did not affect her opinion of them. She said that she and her family had been on cruises with the Jacksons, that they had stayed with them at their house on a nude beach in France, and that she had been to France with the Jacksons without her family. She admitted that she had been photographed while nude by the Defendant-Appellant's older daughter and that the Defendant-Appellant, who was also nude, was around while the pictures were taken and had edited the photographs on his computer. She acknowledged that girls under eighteen years of age, including ALJ and ALJ's younger sister EJ, had been photographed while nude because she had seen the photographs on the Defendant-Appellant's computer. Smith claimed that ALJ had her parents' permission to be photographed nude, although she did not have personal knowledge of that fact.

Robert Henry Jackson, the Defendant-Appellant, testified that he owned an interest in three different businesses related to Music Row in Nashville, explaining that he did "a lot of television and film production, post-production work, editing, that sort of stuff" and "consult[ed] for universities and other non-profits." He said that, prior to being charged with the offenses in this case, he had never been charged with a crime in his life.

The Defendant-Appellant said that he had been married to Sabrina Jackson for twenty-seven years and that she was present in the courtroom. He noted that his wife, who had been exposed to naturism when she spent her summers in Germany, initially convinced him to adopt the naturist lifestyle. However, he asserted that neither he nor his family were "swingers" or exhibitionists. Once he and his wife had children, their children's friends had to obtain permission from their parents before they were allowed to participate in the naturist lifestyle at their home. The Defendant-Appellant stated that ALJ's parents were first made aware of their naturist lifestyle when his daughter asked that AJ come with them to France, and they later gave permission for AJ's younger sister ALJ to participate in the naturist lifestyle. He said ALJ and EJ joined in the naturist lifestyle with them at a younger age because AJ regularly brought her sisters to the Jacksons' home.

The Defendant-Appellant said that ALJ first visited his home when she was ten or eleven years old and that he first had contact with her when he noticed that she was cutting herself. He later learned that there was an allegation that ALJ had been raped at a football game. Shortly thereafter, ALJ began having sexual relations with various men.

When ALJ changed from a happy teenager to a person who was "angry all the time," he and his wife became concerned. They believed that many of ALJ's problems stemmed from the fact that her parents worked all the time and were never at home. Prior to filing the dependency and neglect petition, he and his wife regularly ate dinner with ALJ's parents and spent holidays together, and they routinely communicated by telephone and text. He said eventually ALJ's parents began contacting him whenever ALJ had some kind of problem. ALJ later told him that she had been gang raped.

By January 2011, it became clear to the Defendant-Appellant and his wife that ALJ was getting more out of control and was constantly placing herself in dangerous situations. He said ALJ was obviously unhappy at her parents' home because when it was time for her to leave his house and return home, "she'd roll up in a ball in the floor and cry." When ALJ's father insisted that she return home, the Defendant-Appellant would take her to her parents' home. The Defendant-Appellant said that when ALJ would get in trouble, he or his wife would pick her up from wherever she was and take her to their home. During one of these incidents, he observed ALJ's mother and father screaming at ALJ, usually about issues that were not related to what had just happened, and ALJ would become enraged and begin yelling back. He stated that ALJ had stayed with his family for more than a couple of weeks at a time before he and his wife filed the dependency and neglect petition and that ALJ stayed with his family for three weeks shortly before going to France with them for five weeks. When ALJ stayed with his family for an extended period of time, she would be placed on the chore list and would be assigned chores like his daughters.

The Defendant-Appellant said ALJ told him she wanted to live with his family three times before he filed the dependency and neglect petition. He and his wife talked to ALJ's parents about her desire to live with them and notified them about the petition the weekend before they filed it. They finally decided to file the petition for dependency and neglect after he had to report ALJ's rape to the Franklin Police Department. The Defendant-Appellant said he and his wife asked for a trial custody change in the petition with the hope of getting ALJ to stop running away and hurting herself.

In December 2011, the agreed order was entered, listing several conditions that ALJ was required to follow, particularly regarding social media. The Defendant-Appellant claimed ALJ would "cruise for men" on Facebook by posting provocative pictures of herself and would "transfer the text so it'd be harder to keep track of what was going on [.]" He said ALJ would sneak out of her home through the window to meet men and "had this perverse sexual problem of going out and picking up strangers." He added, "[W]e were afraid she was going to end up in a landfill, you know, we didn't know who she's going to pick up one night." The Defendant-Appellant acknowledged

that ALJ's parents filed a criminal contempt petition against him and his wife containing 250 counts and that he and his wife filed a counter-petition for contempt against ALJ's parents.

The Defendant-Appellant stated that he gained access to ALJ's Facebook account through his mother's account because his mother was a "friend" of ALJ's on Facebook. He also asked other individuals who were her Facebook "friends" to "see what she'd been up to." When ALJ stayed with his family, he required her to disclose her passwords. ALJ's mother also gave him ALJ's passwords because she knew he was monitoring her on Facebook.

The Defendant-Appellant explained the phone conversation with his wife that took place approximately thirty minutes after his arrest: "Well, if you remember the recording, I didn't initiate the conversation. . . . I think my wife was concerned that the computer had gone missing, is what she said in that recording. I said, it's in the office; so I wasn't trying to hide anything." He said his wife was worried about the location of his computer because he had been writing an article for the newspaper about Williamson County juveniles that placed the sheriff's department in an unflattering light. He stated that no one ever asked him for his computer following his conversation with his wife.

The Defendant-Appellant said that after filing the dependency and neglect petition, he saw ALJ only two times outside of court, including the incident on June 5, 2012, at AE's apartment. On June 5, 2012, he received a text regarding ALJ, and he and his daughter decided to go to ALJ's boyfriend's home to determine whether ALJ had run away to Nashville. Once there, the Defendant-Appellant asked him where ALJ was, and after talking to him, the Defendant-Appellant and his daughter drove to the apartment complex where they believed AE lived. He found AE's car because of her personalized license plate and saw ALJ's driver's license on the front passenger seat. When he and his daughter checked the pool, the Defendant-Appellant found AE, recognizing her from some photographs she had posted on Facebook. The Defendant-Appellant parked his car near the pool and called his attorney. As he looked up, he saw ALJ running away, and he told his attorney that he had to go. The Defendant-Appellant then drove over to AE as she was getting into her car, and his daughter ran after ALJ asking for her to stop. The Defendant-Appellant told AE, "I'm not calling the cops and I'm not with the parents; so go tell her to stop, please, get her to stop running before she makes things worse, just go tell her whatever, get her to stop running." He said he was searching for ALJ that day because "[t]wo weeks prior she had put a post out on her Facebook where she was befriending . . . [the ringleader] of the three men accused of raping her[.]" He said that when he saw her post, he notified the court and the Guardian ad Litem that ALJ was "messing with a dangerous group again" but heard no response.

-13-

The Defendant-Appellant's daughter and AE drove to pick up ALJ. The Defendant-Appellant followed at a distance and saw that AE had spotted ALJ at the other end of the apartment complex. After ALJ talked with AE, she came back to the Defendant-Appellant's car and got into the passenger seat. The Defendant-Appellant said he told ALJ that she was not supposed to be contacting him, and she acknowledged this was true. When he asked what she wanted to do, ALJ said, "I want to come live with you guys." The Defendant-Appellant said that living with him and his family was "just not going to happen." The Defendant-Appellant asked if he could have a private moment with ALJ. ALJ said that they needed to go inside because the police were looking for her. After he parked his car in the guest parking lot for the complex, ALJ waved him into the apartment. Once inside, ALJ said she had told her father that she was running away to Nashville during an argument, even though this was not true. The Defendant-Appellant asked ALJ if she was serious about living with him because she had been telling everyone "everything else," and ALJ said that living with him was what she wanted to do. He told her, "[I]f you're going to pursue that, [then] you're going to have to go to some sort of group home, because if you can't make it work at your house, you need to go somewhere else where you can make life work for you, but you're not going to be able to come to us." ALJ asked for twenty dollars, and he refused to give her this money. When ALJ started talking about coming over to his pool, he told her that if she came to his home, he would call the police. He told her that she had to turn herself in, and if she needed help, there was an attorney that had been retained to help her younger sister EJ pursue the possibility of emancipation, and he encouraged her to call this attorney. He offered to get her a job in France as an au pair, and ALJ said she was not interested because she did not want to care for little children. Before leaving, he told her to get to a group home and call the attorney he had mentioned. During their conversation, the Defendant-Appellant noticed that ALJ had three tick bites on her back, which indicated to him that wherever she had been sleeping was not clean, and saw that she had wounds from where she had been cutting herself on her arm. He acknowledged that he was under a no contact order at the time and knew he was probably "going to get in trouble . . . at some level for talking to her or she talking to me," but he felt he "couldn't let this kid take off running."

The Defendant-Appellant stated that his house rules were no drinking, no drugs, no talking back, and no fighting. As his children got older, he would allow them to have "a beer here and there, but nobody's getting drunk" and said other people's children were not allowed to have beer at his home. He said there were no sex parties at his house, and he had never encouraged ALJ to have inappropriate sexual relationships. He explained, "I have four daughters, I don't need anyone having a grandchild in an [in]appropriate time; so we do take steps to make certain things available to help prevent that, but, you know, no, we don't encourage inappropriate sex." He added, "[ALJ] was not your

normal kid, that you're trying to say don't do something, but at the same time you've got to say . . . here's a condom, for God's sake, do something, quit doing what you're doing." He said that ALJ had to receive a Depo-Provera birth control shot before going with his family to France because "there was too much freedom in France for her to go unprotected, and that's the rule."

The Defendant-Appellant said that although he did not remember making a phone call requesting to be a foster parent, his wife did make such a call. He also stated that based on the Guardian ad Litem's suggestion, he, his wife, and their adult daughters all attended the required classes for being a foster parent. He said that "if a child goes into foster care and they have a relationship with you, you're allowed to request to be a possible potential parent."

The Defendant-Appellant stated that the reason he did "so well with teens" was they could ask him anything. He stated that one afternoon, ALJ, in front of his youngest daughter, asked him what he liked about oral sex or how do you do oral sex, which was "a question that pushed the boundary." He responded, "You know what, you know what good oral sex is? That's something between two lovers who really care for each other and, you know, it's going to take 20 minutes. And if you want to know anything more else about it, you're going to have to be 18." He asserted that ALJ knew what oral sex was at the time because she had been sexually active since she was fourteen years old and had somehow "confused having sexual relations with getting affection from people." He also said that ALJ's posts on Facebook made it clear that she was giving men oral sex in exchange for alcohol.

When asked if he had ever talked to ALJ about her pubic hair, he stated:

> She was the age of 14 or 15 and she was shaving off her pubis, and it just looked ridiculous. And I know her mother wouldn't approve, you know. . . . [S]he tries to do belly rings and tattoos and things that her mother wouldn't like. So just because she's gotten away with something that she thinks her mother wouldn't see, doesn't mean I'm not going to yell at her. I ain't going to yell, but I admonished her about it and I said it's just not appropriate.
>
> . . . .
>
> Well, that's not natural, you know. You get [of] an age, you have pubic hair, why are you lopping it off unless you're trying to be an exhibitionist.

-15-

The Defendant denied purchasing a sex toy for ALJ and denied encouraging her to use one.

The Defendant-Appellant said that ALJ's boyfriend had been a constant problem because they skipped school and ran away. Although ALJ's father did not want ALJ to continue to see her boyfriend, the Defendant-Appellant allowed him to visit his home. He acknowledged providing condoms to ALJ when he believed she was going to have sexual relations with her boyfriend. The Defendant-Appellant asserted that he "didn't encourage her to have sex with anybody" but noted that ALJ's relationships with males were "almost completely dominated by sex, there was something clearly wrong with [ALJ], and [had been] wrong for a very long time." He stated that when ALJ was with his family, they spent a lot of time trying to keep her "reined in" and tried to give her "healthy examples." The Defendant-Appellant said that he provided condoms to ALJ with her parents' permission.

The Defendant-Appellant stated that although it would have been easier for him and his family to cut off all contact with ALJ, they were Christians and believed in doing the right thing even if it was difficult. He claimed that over the years, he had helped adults and teenagers by providing financial help or counseling. He said he often helped young girls because he had four daughters but asserted that he often talked with a woman his age in Argentina when she felt depressed and with a twenty-seven-year-old woman in Utah when she felt suicidal. He said he helped some men as well, including an adult man that had been abused as a child, a boy from his neighborhood that the Department of Children's Services had tried to assist, and a man who was addicted drugs. He said he did not usually allow men to stay at his home because he had four daughters but allowed many young women to live at his house when they did not "feel safe at home" or could not "function at their home." When asked if these young women provided a steady stream of girls to be photographed, he eventually acknowledged that three girls had been photographed at his home, and two of the three girls were ALJ and her younger sister EJ.

The Defendant-Appellant asserted that ALJ and EJ were allowed to be nude in his home with their parents' permission. He also stated that three other sets of parents had allowed their minor children to be nude at his home. He admitted that he was often without clothes in his own home and had disclosed this information to the children's parents. The Defendant-Appellant asserted that AJ's testimony that she was rewarded with alcohol the first time she took off her clothes was false and that AJ "lied a lot." He acknowledged assisting his daughter with her photography because he understood how cameras worked and allowed her to photograph individuals at his home and at his beach house in France. He said he had stored these nude photographs on his computer but denied editing them. He claimed that the photographs were placed on his computer

before traveling overseas so that they would not be lost and so that he could help his daughter determine which ones she wanted to submit for shows. However, he said the photographs were deleted once these purposes were served so there were not "loose photographs of young women floating around."

The Defendant-Appellant claimed that he and his wife hired an attorney to get a settlement, not to get custody of ALJ. However, when he was asked why he inquired about becoming a foster parent if he was not interested in obtaining custody, he said that the Guardian ad Litem suggested that they try to become foster parents. When he was questioned about whether he thought it was a good idea to have ALJ in his home naked when she was over-sexed, the Defendant-Appellant said that he did not recall her having sex with anyone she encountered at their house and that her actions had "no relationship to [their] naturism." He said that it was not a bad idea to take ALJ to France and maintained that his home in France was not "an over-sexed, alcohol-driven environment." He admitted that after ALJ made a negative comment about her breasts, he said, "Don't worry about it, they'll grow in."

## ANALYSIS

**I. Sufficiency of the Evidence.** Although not clearly articulated in his brief, the Defendant-Appellant appears to argue that the indictment and the bill of particulars failed to charge him with the crime of contributing to the delinquency of a minor and that the evidence presented at trial failed to constitute this crime. In our view, the Defendant-Appellant essentially makes a sufficiency of the evidence claim, and we will treat it as such. As we will explain, the proof is sufficient to sustain the Defendant-Appellant's conviction.

Count 5 of the indictment charged the Defendant-Appellant with the offense of contributing to the delinquency of a minor:

> The Grand Jurors for Williamson County, Tennessee, duly impaneled and sworn, upon their oath, present that ROBERT HENRY JACKSON AND KEMERLEE OLGA JACKSON, heretofore, to-wit, on June 05, 2012, before the finding of this presentment, in said County and State, unlawfully did contribute to or encourage the delinquency or unruly behavior of a child under the age of eighteen (18) years, whose date of birth is 9/26/1995, in violation of Tennessee Code Annotated 37-1-156, a class A misdemeanor, and against the peace and dignity of the State of Tennessee.

-17-

For purposes of this case, the offense of contributing to the delinquency of a minor is defined as follows:

> Any adult who contributes to or encourages . . . unruly behavior of a child, whether by . . . encouraging the child in the commission of . . . unruly conduct or by . . . aiding the child in concealing . . . unruly conduct following its commission, commits a Class A misdemeanor, triable in the circuit or criminal court.

T.C.A. § 37-1-156(a)(1) (2012).

The State, in response to the Defendant-Appellant's request, filed a bill of particulars shortly before trial, providing the following information as to count 5:

> Defendant is alleged to have contributed to the delinquency of ALJ on June 5, 2012. The State alleges that Defendant contributed to ALJ's delinquency on June 5, 2012, by the fact that Defendant discovered ALJ's location and knew that ALJ was a runaway. Defendant, however, did nothing to report ALJ to authorities. Instead, Defendant used ALJ's runaway status and ALJ's desire to not be located by law enforcement to further Defendant's own wishes for ALJ. Defendant should have called law enforcement on ALJ. Instead, Defendant used ALJ's fear of being located to talk to ALJ about Defendant's desire for ALJ to be in Defendant's home and in Defendant's custody.

Following the close of proof, the trial court provided the following instruction to the jury in accordance with the Tennessee Pattern Jury Instructions:

> Contributing to the Delinquency of a Child. This is alleged in Count [5]. Any person who contributes to the delinquency of a child is guilty of a crime. For you to find the Defendant guilty of this offense, the State must have proven, beyond a reasonable doubt, the existence of the following essential elements: Number one, that the Defendant contributed to . . . or encouraged delinquency or unruly behavior of a child whose date of birth is **/**/1995; and two, that the Defendant did so by encouraging the child in the commission of an act of . . . unruly conduct or delinquency; and three that the Defendant acted either intentionally, knowingly or recklessly. . . .
>
>     . . . .

-18-

A child is unruly if . . . (D) [she] is away from the home or residence of his or her parents or guardians without their consent. Such child shall be known and defined as a runaway.

See 7 Tenn. Prac. Pattern Jury Instr. T.P.I.—Crim. 21.08 (2015 ed.).

First, the Defendant-Appellant claims that although the indictment and bill of particulars alleged that he violated Code section 37-1-156 by failing to report ALJ to "law enforcement" or "authorities" after learning that she was a runaway, the evidence presented at trial established that she was not a runaway. As support, he cites to ALJ's father's testimony that ALJ was not a "runaway," which he claims was never contradicted by other witnesses, and the fact that ALJ was never adjudicated or declared a runaway by any court. The Defendant-Appellant argues that because ALJ was not a "runaway," he could not have reported her as a runaway and could not have committed the offense charged. We disagree.

We begin our analysis by recognizing that the contributing to the delinquency of a minor statute "was enacted not only to protect those children already delinquent from becoming more so, but also to prevent non-delinquent children from becoming delinquent. [It] arms the State with a two-edged sword with which to combat acts which contribute to or encourage the delinquency of a child." Lovvorn v. State, 389 S.W.2d 252, 255-56 (Tenn. 1965) (internal quotations omitted). The statute is clearly aimed at punishing improper conduct of an adult, not the minor child. As such, whether a minor child has been adjudicated delinquent or unruly in a court of law has no bearing on an adult's actions in contributing to or encouraging delinquent or unruly behavior. Accordingly, we hold that there is no requirement that minors actually be declared delinquent or unruly in a court of law to convict an accused of contributing to the delinquency of a minor. See J.A. Bock, Annotation, Criminal Liability for Contributing to Delinquency of Minor as Affected by the Fact that Minor Has Not Become a Delinquent, 18 A.L.R.3d 824, 1968 WL 15919 (1968) (as a general rule a judicial declaration of delinquency not necessary to sustain conviction); see also People v. Owens, 164 N.W.2d 712, 716 (Mich. Ct. App. 1968); State v. Hayes, 351 N.W.2d 654, 657 (Minn. App. 1984).

Moreover, in this case, the evidence at trial established that ALJ's father filed a "runaway petition" regarding ALJ with the Williamson County Juvenile Court. ALJ's father testified that on the morning of June 4, 2012, ALJ left her residence without the knowledge or permission of her parents and that ALJ's whereabouts were unknown. Although ALJ's father said that ALJ had "never actually run away" from their home, he filed the petition because the juvenile court's agreed order required him to contact the

-19-

appropriate authorities if ALJ "was not . . . where she was supposed to be[.]" In addition, ALJ and her friend, AE, testified that ALJ was "on the run" on June 5, 2012, and that the Defendant-Appellant promised not to report ALJ to the police if she agreed to talk to him. Given this evidence, a rational jury could have found that the Defendant-Appellant encouraged ALJ in the commission of unruly conduct at the time of the June 5, 2012 incident.

Second, the Defendant-Appellant argues that even if ALJ was a runaway, his failure to report her as a runaway is not a crime because no Tennessee statute compels an ordinary citizen to report a runaway to the authorities and no statute imposes a general duty to report a crime. He notes that he filed a motion regarding this issue prior to trial, which was denied, and that he requested a jury instruction stating that Tennessee law does not require a person to report a runaway to police, which the trial court declined to provide. However, he did not include the pertinent portions of the record regarding the trial court's denial of his motion and his request for this instruction, which technically results in waiver of these issues. See Tenn. R. App. P. 24(b); State v. Bibbs, 806 S.W.2d 786, 790 (Tenn. Crim. App. 1991) ("In the absence of an adequate record on appeal, we must presume that the trial court's ruling was supported by the evidence.").

Nevertheless, because this issue was developed sufficiently at the hearing on the motion for new trial, it merits our review. The Defendant-Appellant claims he had no obligation to report ALJ's runaway status to the police pursuant Tennessee Code Annotated section 37-1-403 because there was no evidence that ALJ suffered an injury or harm "caused by brutality, abuse, or neglect" at the time of the incident in this case. To the extent that the Defendant-Appellant argues that the contributing to the delinquency of a minor statute contains no affirmative duty to report unruly runaway behavior of a minor to law enforcement, we agree. Indeed, neither the statute nor the pattern jury instruction for this offense requires the jury to find, beyond a reasonable doubt, that the Defendant-Appellant had a duty to report ALJ's status as a runaway before convicting him of this offense. The duty to report a runaway is also not an element of the offense of contributing to the delinquency of a minor. More to the Defendant-Appellant's point, however, we acknowledge that the bill of particulars contains language that he "did nothing to report" ALJ and that "he should have called law enforcement." Although the State may not press its prosecution on a theory upon which the defendant has not been informed or has been misled, see State v. Wilcoxson, 772 S.W.2d 33, 39 (Tenn. 1989), the extent to which the State is bound by a bill of particulars is primarily a function of notice. See State v. Sherman, No. E2006-01226-CCA-R3-CD, 2007 WL 2011032, at *5 (Tenn. Crim. App. July 12, 2007), aff'd, 266 S.W.3d 395 (Tenn. 2008). In our view, the bill of particulars did not mislead or exclusively rely on the Defendant-Appellant's failure to report ALJ to the authorities such that it deprived him of a fair trial. The bill of

-20-

particulars included the prosecution's theory that he actively encouraged ALJ's runaway status as a way to manipulate her into talking with him that day. He encouraged her not to return home and provided her an attorney's name and phone number, telling her she could live at his home, and offering her a job as an au pair in France. Accordingly, the Defendant-Appellant is not entitled to relief on this issue.

Third, the Defendant-Appellant argues that evidence regarding his violation of the no contact order should not be used to support his conviction in count 5. He claims the bill of particulars only referenced his violation of the no contact order in count 2, one of the two aggravated stalking counts for which he was acquitted, and count 2 covered acts allegedly occurring on a date different than June 5, 2012. The Defendant-Appellant adds that violation of a court order is punishable by a contempt proceeding and that the appeal of his contempt case is currently pending before the Tennessee Supreme Court. See In re A.J., No. M2014-02287-COA-R3-JV, 2015 WL 6438671 (Tenn. Ct. App. Oct. 22, 2015) (second appeal following remand reversing the finding of twenty-eight counts of contempt, affirming the sentence of four counts of contempt and the trial court's denial of the motion to recuse, and remanding the case to the trial court to reinstate the Defendant-Appellant's original convictions for four counts of contempt), perm. app. filed, No. M2014-02287-SC-R11-JV (Tenn. Dec. 21, 2015).

Here, the Defendant-Appellant appears to make another layered challenge to the bill of particulars. To the extent the Defendant-Appellant claims that information pertaining to the no contact order should not have been admitted at trial, the record shows that the trial court conducted extensive Rule 404(b) hearings to determine the admissibility of a variety of evidence prior to trial. However, the Defendant-Appellant has waived any objection to the admissibility of this evidence by not including the transcripts from these hearings in the appellate record and by not challenging the admissibility of this Rule 404(b) evidence on appeal. Therefore, while the no-contact order evidence was not the basis for count 5, we are compelled to conclude that the jury was free to consider it when determining whether the Defendant-Appellant committed the offense in count 5 because such proof established the Defendant-Appellant's intent and motive to commit the offense of contributing to the delinquency of a minor.

In as much as the Defendant-Appellant argues that the jury was limited to considering only the information outlined in the bill of particulars for count 5 and barred from considering any information outlined in the bill of particulars from the acquitted counts in support of the conviction for count 5, we believe the Defendant-Appellant misapprehends the purpose of a bill of particulars. See State v. Campbell, 904 S.W.2d 608, 611 (Tenn. Crim. App. 1995) (citations omitted) (noting that purpose is to provide a defendant with enough information about the charge against him to allow him to prepare

-21-

a defense, to avoid prejudicial surprise at trial, and to enable him to preserve a plea of double jeopardy). An acquittal on one or several charges in a multi-count indictment does not preclude a conviction under one or more of the other charges. State v. Millbrooks, 819 S.W.2d 441, 446 (Tenn. Crim. App. 1991) (citing Wiggins v. State, 498 S.W.2d 92, 94 (Tenn. 1973)). The verdict herein is not infirm simply because the jury chose to acquit the Defendant-Appellant on other related counts in the indictment. Although the State's brief seems to rely on evidence from the acquitted counts in support of the sufficiency of the evidence in count 5, as will be discussed more fully below, there was sufficient evidence from which any rational trier of fact could find the Defendant-Appellant guilty of contributing to or encouraging the delinquency of a minor beyond a reasonable doubt.

Finally, the Defendant-Appellant argues that he did not violate Code section 37-1-156(a)(1) because there was no proof that he contributed or encouraged the victim to engage in unruly behavior or a delinquent act on June 5, 2012, the date specified in the indictment. The Defendant-Appellant argues that he was wrongly convicted for acts that occurred on days other than June 5, 2012, and claims that because his conduct was not illegal, his conviction for this offense violates his due process rights under federal and state law. While acknowledging that his naturist lifestyle is unpopular, unorthodox, and offensive to some, the Defendant-Appellant asserts that "due process and the law of the land clauses protect individuals with unpopular opinions or lifestyles from arbitrary conduct by the police and the State."

Viewed in the light most favorable to the State, there was sufficient evidence for a rational jury to find beyond a reasonable doubt that the Defendant-Appellant committed the offense of contributing to the delinquency of a minor on June 5, 2012. The jury was free to consider evidence regarding the Defendant-Appellant's relationship with ALJ, his home environment and lifestyle, and other incidents involving ALJ because such evidence was relevant and established the Defendant-Appellant's motive and intent to commit the offense of contributing to the delinquency of a minor.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is

"whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Parker, 350 S.W.3d 883, 903 (Tenn. 2011) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting Hanson, 279 S.W.3d at 275). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court shall not substitute its inferences for those drawn by the trier of fact. Id.

As we previously noted, for purposes of this case, an adult commits the offense of contributing to the delinquency of a minor if he "contributes to or encourages . . . unruly behavior of a child, whether by aiding or abetting or encouraging the child in the commission of an act of delinquency or unruly conduct . . . or by aiding the child in concealing an act of delinquency or unruly conduct." T.C.A. § 37-1-156(a)(1) (emphasis added). Although "unruly behavior" is not defined in this chapter, an "unruly child," for purposes of this case, is defined as "a child in need of treatment and rehabilitation who . . . . . [i]s away from the home, residence or any other residential placement of the child's parent(s) . . . without their consent. Such child shall be known and defined as a 'runaway[.]'" Id. § 37-1-102(b)(25)(A) (2012). A "delinquent act" is "an act designated a crime under the law." Id. § 37-1-102(b)(9). However, a "delinquent act" does not include a "status offense" like that of a "runaway" under Tennessee Code Annotated section 37-1-102(b)(25). See id. Accordingly, the indictment and bill of particulars charged the Defendant-Appellant with contributing to the "unruly behavior" of ALJ "by aiding or abetting or encouraging" her status as a "runaway." See id. § 37-1-156(a)(1).

The offense of contributing to the delinquency of a minor "may involve a single act or course of conduct, and may be committed in an unlimited variety of ways which tend to produce or encourage or to continue conduct with a child which would amount to delinquent conduct." Birdsell v. State, 330 S.W.2d 1, 5 (Tenn. 1959) (citing

-23-

Commonwealth v. Stroik, 102 A.2d 239, 241 (Pa. Super. Ct. 1954). "Since the statute is aimed at the behavior of the adult, the minor does not actually have to commit an act of delinquency for the adult to contribute to the minor's delinquency." State v. John D. Cooke, III, No. W1998-01767-CCA-R3-CD, 1999 WL 1531347, at *10 (Tenn. Crim. App. Dec. 28, 1999) (citing Lovvorn, 389 S.W.2d at 256; Birdsell, 330 S.W.2d at 6). This court has affirmed convictions for contributing to the delinquency of a minor based on a variety of conduct, including conduct similar to the conduct in this case. See State v. Christopher Steven Nunley, No. M2000-00903-CCA-R3-CD, 2001 WL 361004, at *3 (Tenn. Crim. App. Apr. 12, 2001) (concluding that the evidence was sufficient to sustain a conviction for contributing to the delinquency of a minor when the defendant helped the victim run away from home shortly after she was returned to her residence following an absence of over three weeks and continued to assist the victim in avoiding a return to her parents' home for several months prior to trial); State v. James Carl Stessl, No. 87-128-III, 1988 WL 82419, at *2 (Tenn. Crim. App., at Nashville, Aug. 9, 1988) (affirming the defendant's conviction for contributing to the delinquency of a minor when the evidence showed that the defendant encouraged the child to remain a runaway by discouraging the child from having contact with his relatives and by helping the child escape from a police investigator); see also Lovvorn, 389 S.W.2d at 256 (holding that evidence that the defendant lived in an adulterous relationship with the mother of the child and that the defendant had drunk, fought, and cursed around the child supported the finding that the defendant contributed to and encouraged the child to become delinquent); State v. Letha Dotson, No. E2006-02784-CCA-R3-CD, 2007 WL 2323394, at *2 (Tenn. Crim. App. Aug. 15, 2007) (concluding that a rational jury could have found beyond a reasonable doubt that the defendant, who did not supply the marijuana cigarette but did nothing to stop the three children in her car from smoking the cigarette, committed the offense of contributing to the delinquency of a minor); State v. Christopher R. Pierce, No. M2005-01708-CCA-R3-CD, 2006 WL 2069415, at *11 (Tenn. Crim. App. July 26, 2006) (concluding that evidence that the defendant, who committed the offense of driving while intoxicated and allowed a minor to commit the offense of driving while intoxicated while in the victim's presence and encouraged the victim to sneak out of her parent's home and ride in his car without her parent's permission was sufficient to support the defendant's conviction for contributing to the delinquency of a minor as to the victim).

We have already concluded that a rational jury could have found that ALJ was on "runaway" status on June 5, 2012. Although the Defendant-Appellant claimed he was looking for ALJ because he feared she was with a man who had previously raped her, it was the jury's prerogative to discredit this testimony and accredit the testimony from ALJ, AE, and RH, who all stated that the Defendant-Appellant knew ALJ had run away from her parents' home and had diligently searched for ALJ until he found her. Although the Defendant-Appellant claims that he was wrongfully convicted for his failure to call

the police on June 5, 2012, we disagree. The Defendant-Appellant encouraged ALJ to continue her unruly runaway behavior by telling her, "I could easily call the cops right now," offering to protect her by stating, "I can hide you out at my house because that's the last place they're going to look," and promising her a better life by telling her, "[W]e can go to France." Based on this evidence, a reasonable jury could have found that once the Defendant-Appellant located ALJ, he actively encouraged ALJ's runaway status by threatening to call the police, offering to protect her, and promising her a better life as a way of manipulating her into living in his home and being in his custody. We conclude the evidence is sufficient to sustain the Defendant-Appellant's conviction for contributing to the delinquency of a minor.

**II.** **Sentence.** The Defendant-Appellant also contends that his sentence is excessive. Specifically, he claims that the imposition of a ninety-day period of incarceration was overly harsh, that his appeal bond was essentially a fine, and that the no contact provisions concerning ALJ and minors in his home were unnecessary. He claims the trial court imposed an excessive sentence after determining that he had "broken societal boundaries." However, he asserts that filing a dependency and neglect petition and being a naturist are not crimes and that he should not have been punished unless his conduct violated the law. After reviewing the record, we conclude that the trial court did not abuse its discretion in imposing the period of incarceration or the other conditions of the Defendant-Appellant's sentence.

In Bise, the Tennessee Supreme Court concluded that a trial court's sentencing determinations in felony cases should be reviewed under "an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012). This standard of review also governs "questions related to probation or any other alternative sentence." State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012). To date, the Tennessee Supreme Court has not addressed whether the abuse of discretion standard with a presumption of reasonableness applies to misdemeanor sentencing. Nevertheless, the reasoning espoused in King, that Bise applies to "all sentencing decisions," suggests that it is the appropriate standard of review to apply to misdemeanor sentencing cases as well. See State v. King, 432 S.W.3d 316, 324 (Tenn. 2014) (emphasis added); see also State v. Michael L. Hufford, No. E2012-02162-CCA-R3-CD, 2014 WL 4403831, at *10 (Tenn. Crim. App. Sept. 8, 2014); State v. Aivar Lang, No. M2013-01839-CCA-R3-CD, 2014 WL 411727, at *3 (Tenn. Crim. App. Feb. 3, 2014); State v. Michael Glen Walsh, No. E2012-00805-CCA-R3-CD, 2013 WL 1636661, at *4 (Tenn. Crim. App. Apr. 17, 2013); State v. Sue Ann Christopher, No. E2012-01090-CCA-R3-CD, 2013 WL 1088341, at *7 (Tenn. Crim. App. Mar. 14, 2013). Therefore, we will apply the Bise standard of review in this case.

Pursuant to the 2005 amendments to the Sentencing Act, a trial court must consider the following when determining a defendant's specific sentence and the appropriate combination of sentencing alternatives:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

T.C.A. § 40-35-210(b) (2012). The defendant has the burden of showing the impropriety of the sentence on appeal. Id. § 40-35-401(d) (2012), Sentencing Comm'n Cmts.

Here, the Defendant-Appellant was convicted of contributing to the delinquency of a minor, a Class A misdemeanor, which carries a maximum sentence of eleven months and twenty-nine days. See T.C.A. § 40-35-111(e)(1) (2012). Sentences for misdemeanor offenses must be specific and in accordance with the principles, purposes, and goals of the Criminal Sentencing Reform Act of 1989. Id. §§ 40-35-104, -302 (2012). The sentencing court is granted considerable latitude in misdemeanor sentencing. State v. Johnson, 15 S.W.3d 515, 518 (Tenn. Crim. App. 1999) (citing State v. Troutman, 979 S.W.2d 271, 273 (Tenn. 1998)). While a separate sentencing hearing is not required in misdemeanor cases, the court must provide the defendant with a reasonable opportunity to be heard as to the length and manner of the sentence. T.C.A. § 40-35-302(a).

"[A] misdemeanor offender must be sentenced to an authorized determinant sentence[,]" and "a percentage of that sentence, which the offender must serve before becoming eligible for consideration for rehabilitative programs, must be designated." State v. Palmer, 902 S.W.2d 391, 394 (Tenn. 1995). Typically, a percentage not greater

than seventy-five percent of the sentence should be fixed for a misdemeanor offender.  Id. at 392-93; see also T.C.A. § 40-35-302(d) (2012).  A trial court has the authority to place a defendant on probation immediately or after service of a portion of the sentence in periodic or continuous confinement.  T.C.A. § 40-35-302(e).  An individual convicted of a misdemeanor has no presumption of entitlement to a minimum sentence.  Johnson, 15 S.W.3d at 518 (citing State v. Baker, 966 S.W.2d 429, 434 (Tenn. Crim. App. 1997); State v. Creasy, 885 S.W.2d 829, 832 (Tenn. Crim. App. 1994)).

Although not required, the trial court held a separate sentencing hearing prior to imposing the Defendant-Appellant's sentence.  During this hearing, the State entered the following documents into evidence:  a victim impact statement from ALJ's family, the December 14, 2011 agreed order containing the reciprocal restraining order, the January 9, 2012 order stating that the reciprocal restraining order would remain in effect, the petition for criminal contempt and the February 5, 2013 order finding the Defendant-Appellant guilty of twenty-seven counts of criminal contempt, the Defendant-Appellant's Facebook post to ALJ following his conviction, and the Tennessee Court of Appeals opinion from the first appeal affirming the Defendant-Appellant's four convictions for criminal contempt, vacating the sentences imposed, and remanding the case for resentencing.  See In re Anna L.J., No. M2013-00561-COA-R3-JV, 2014 WL 1168914 (Tenn. Ct. App. Mar. 20, 2014).  The defense entered a memorandum requesting diversion or other alternative sentence, which contained over twenty letters from family, friends, and business associates stating positive things about the Defendant-Appellant and asking that he not be sentenced to incarceration, and a document from the Tennessee Bureau of Investigation showing that the Defendant-Appellant did not have a prior felony or misdemeanor that would disqualify him from receiving diversion.

The State presented the testimony of Cheryl Roach, who testified that the Defendant-Appellant lived in her neighborhood and their children were friends.  Roach said that in the fall of 2013, after the Defendant-Appellant's arrest, the Defendant-Appellant asked if she would help him determine whether ALJ wanted to live at his home or her parents' home by having Roach talk to her about whether she was "okay or safe or where she wanted to live."  The Defendant-Appellant admitted to Roach that he could not legally ask ALJ these questions himself.  Roach subsequently talked to ALJ about where she wanted to live.

Sabrina Jackson, the Defendant-Appellant's wife, testified that she and the Defendant-Appellant had been married for twenty-seven years and had four children, and they owned four companies, which employed ten to twelve people.  She stated that her husband had a very "hands on approach," serving as business manager, salesman, and creative director for their companies, and asked the trial court not to incarcerate him.

Although Mrs. Jackson asserted that her husband never photographed nude children in their home, she acknowledged that he assisted their older daughter in editing these photographs after the fact and in storing these photographs on his computer. She said that her husband "possibly" told minor children how to groom their public hair. She also acknowledged that just days after the conclusion of his trial, her husband posted a statement to Facebook referencing his nickname for ALJ, which was "Monkey," and stating, "This home is open 24/7 for you and others that need it. Love always conquers hate." Although she did not recall whether her husband told her that he was going to post that statement, she said she did not object to it.

The Defendant-Appellant also testified at the sentencing hearing. He admitted making the Facebook posting directed at ALJ, even though they were not Facebook "friends" at the time. He asserted that it was not "an unusual message" to post because he regularly helped individuals in need. The Defendant-Appellant said he provided the principal support for his family and managed their four companies on a daily basis by taking care of payroll, following up with sales, and negotiating deals. While he acknowledged that there were other owners of his companies, he said these individuals were creative people who did not handle the financial or sales issues. The Defendant-Appellant claimed that his family would suffer financially if the trial court ordered incarceration, noting that he had already been forced to ask for the return of his cash bond in order to cover payroll for his employees. He said he was "not a bad guy" and was sorry he "misstepped here and caused some trouble." He also reiterated that he had no prior convictions before receiving the misdemeanor conviction in this case. He admitted that after he was arrested he asked Cheryl Roach to talk to ALJ about whether she wanted to live with him.

After hearing this proof and arguments from counsel, the trial court began its analysis by observing that this case was "one of the most bizarre cases [it] had heard in the 16 years that [it] had the honor of being a trial judge[.]" After considering the factors for and denying judicial diversion, the trial court applied enhancement factor (2), that the Defendant-Appellant was a leader in the commission of an offense involving two or more criminal actors, because he enlisted the help of his daughter when he went to AE's apartment complex looking for ALJ. See T.C.A. § 40-35-114(2) (2012). The court also applied enhancement factor (4), that the victim in this case was particularly vulnerable because of her age. See id. § 40-35-114(4) (2012). It noted that ALJ was "a deeply troubled child" and that the Defendant-Appellant provided guidance to her that he was not qualified to give. The trial court also applied enhancement factor (14), that the Defendant-Appellant abused a position of private trust. See id. § 40-35-114(14) (2012). The court recalled the Defendant-Appellant's telling ALJ that he "would not call the police if she would talk to [him]" and asserted that he "took this vulnerable child and

caused her additional harm." The trial court considered these factors before setting the length of the sentence at eleven months and twenty-nine days, with minimum service percentage of seventy-five percent.

The trial court held that confinement was necessary to avoid depreciating the seriousness of this offense and was particularly suited to providing an effective deterrence to others likely to commit similar offenses. See id. § 40-35-103(1)(B) (2012). The court recognized that the Defendant-Appellant had been convicted of criminal contempt in juvenile court for his failure to follow that court's order not to contact ALJ and that these contempt convictions had been upheld by the Tennessee Court of Appeals. It then denied full probation for the Defendant-Appellant:

> I am satisfied that you are not a good candidate for probation, complete probation. You demonstrated you can't follow the Court's Orders. You and your wife's evasive attitudes about just answering simple questions is just mind boggling to the Court. And to think that you are going to be able to follow the rules and conditions of probation which are straight forth is a joke. You will have some evasive reason for why you shouldn't follow it and I'm satisfied you are a very, very poor and weak candidate for probation.

The court placed the Defendant-Appellant on probation after service of ninety days incarceration in the Williamson County Jail. It held that this sentence was "no greater than that deserved for the offense committed in this troubling case" and was "the least severe measure necessary to achieve the purpose for which it [was] being imposed." See id. § 40-35-103(2), (4) (2012). The court also ordered the Defendant-Appellant to have "absolutely no contact in [any] form or fashion with this young lady, [ALJ]." He added:

> [A]s sharp and conniving as you are, Sir, I know you are going to figure out a way to [have contact with her]. I'm just saying to you, you are not to even speak the name [ALJ], you are not to write the name [ALJ], you are not to even breathe the name [ALJ], or you will be in violation of probation.

The court also ordered the Defendant-Appellant "to have absolutely no contact with [ALJ's] family." Finally, the court ordered him "to have no children in your home other than your blood relatives who are under the age of 18." This order was subsequently amended to allow children who were related to the Defendant-Appellant by law or were his step-grandchildren to be in his home.

During sentencing, the trial court told the Defendant-Appellant, "The lengths you went to destroy the parent child relationship that existed between this child [ALJ] and her parents are just shocking to the Court, troubling and frightening." The court added that although the Defendant-Appellant had "an opportunity to help save this child," he instead had "wreck[ed] and further wreck[ed] this child's life." At the conclusion of the sentencing hearing, the court made this final statement to the Defendant-Appellant: "You have never accepted responsibility for the damage you have done to this child. You have never apologized. You only continue to enhance the situation and worsen this child's condition[,] and I hope God will forgive you for that, but the Court will not."

The court set the Defendant-Appellant's appeal bond at $50,000, asserting that the Defendant-Appellant would be required to be in custody until this bond was made. When defense counsel asserted that the Defendant-Appellant's bond at trial was $25,000 and that this "seem[ed] to be an awfully high bond for a misdemeanor," the court asserted that it was setting the appeal bond at $50,000 because the presumption of innocence regarding this misdemeanor had been removed.

First, the Defendant-Appellant contends that the trial court's imposition of ninety days' incarceration is an excessive punishment for his minor misdemeanor conviction and that he should have received a sentence of full probation. He claims that the trial court failed to consider the sentencing principles in Code section 40-35-103 prior to imposing this sentence of incarceration. The Defendant-Appellant notes that although the trial court berated him for violating the juvenile court's no contact order, for which he was punished, the record shows that he never violated any of the circuit court's orders.

As support for his claim that he received an excessive sentence, the Defendant-Appellant asserts that he has no prior criminal record, no history of violence, has been married for over twenty years, has four daughters, and two grandchildren. He asserts that "[t]he continued success of his businesses and the livelihood of the twelve employees depends upon his hands-on, day to day participation in his business affairs." He adds that he actively participates in his community and that he and his wife have helped numerous people, young and old, who were in need. He insists that the misdemeanor offense for which he was convicted did not result in physical harm or injury to any person, did not result in any property damage, and lasted a short period of time. Finally, he asserts that numerous family, friends, and business associates were willing to testify on his behalf and wrote letters asking that he serve no jail time.

The record shows that the trial court provided extensive findings as to why it ordered the Defendant-Appellant to serve ninety days in jail prior to serving the remainder of his sentence on supervised probation. The court determined that the

Defendant-Appellant was an extremely poor candidate for full probation because of his inability to follow court orders and his lack of truthfulness. The court also held that some confinement was necessary to avoid depreciating the seriousness of the offense and to provide an effective deterrent. As fully outlined above, these findings are supported by the record. Because the court sentenced the Defendant-Appellant within the appropriate range for the conviction and because the sentence reflected the court's proper application of the purposes and principles of the sentencing act, we conclude that the trial court did not abuse its discretion in denying a sentence of full probation and in imposing a ninety-day period of incarceration. See Bise, 380 S.W.3d at 707.

The Defendant-Appellant also argues that the trial court abused its discretion in setting an appeal bond in the amount of $50,000, given that he never failed to appear at a hearing and never violated any condition of bond prior to trial. He claims that because the amount of the appeal bond exceeded the maximum fine of $2,500 for his misdemeanor, the appeal bond was tantamount to a fine, even though the jury imposed no fine. We note that any issues regarding bond pending appeal must be properly raised by written motion either in the trial court or this court. See Tenn. R. App. P. 8(a); State v. Wright, 836 S.W.2d 130, 136 (Tenn. Crim. App. 1992); State v. Charles Johnston, No. E2002-02028-CCA-R3-CD, 2003 WL 23094414, at *7 (Tenn. Crim. App. Dec. 30, 2003). Because the Defendant-Appellant has not complied with Rule 8, this issue is waived.

Finally, the Defendant-Appellant asserts that the trial court abused its discretion in ordering him to have no contact with ALJ because the record shows that he had only two brief encounters with her over a period of years. He claims that while no contact provisions are authorized for stalking, aggravated stalking, and especially aggravated stalking convictions pursuant to Code section 39-17-315(e), they are not authorized for a conviction for contributing to the delinquency of a minor. The Defendant-Appellant voices his fear that ALJ, or her family, who had previously discussed filing a civil suit against him, might try to "set him up" by claiming he violated the no contact order. He also contends that the provision forbidding him from having minors in his home is inappropriate because the facts of the case related to a single individual. We conclude that the record fully supports the imposition of the no contact provisions regarding ALJ and minors unrelated to the Defendant-Appellant. These provisions are appropriate for the nature of the criminal conduct involved in this case, serve the best interests of the public, and provide an effective deterrent to the defendant. The Defendant-Appellant is not entitled to relief.

## CONCLUSION

Based on the aforementioned authorities and reasoning, the judgment of the trial court is affirmed.

_____
CAMILLE R. McMULLEN, JUDGE